HENRY L. ARCENEAUX, JR., and JIMMIE RUTH ARCENEAUX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Arceneaux v. Commissioner
Docket No. 8929-75
United States Tax Court
T.C. Memo 1977-363; 1977 Tax Ct. Memo LEXIS 78; 36 T.C.M. (CCH) 1461; T.C.M. (RIA) 770363; October 13, 1977, Filed R. Travis Douglas, for the petitioners. Robert E. Glanville, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency in petitioners' joint Federal income tax return for the calendar year 1972 in the amount of $183.68. *79 As a result of concessions by the parties, the sole issue for decision is whether petitioners are entitled to a charitable contribution deduction under section 170[1] for payments made to a qualified charitable organization, with respect to the placement of a child in the petitioners' home by the adoption services agency of the charitable organization. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Henry L. Arceneaux, Jr. and Jimmie Ruth Arceneaux are husband and wife who resided in Gretna, Louisiana at the time their petition was filed. Their joint Federal income tax return for the year 1972 was timely filed with the Director, Internal Revenue Service Center, Austin, Texas. The Associated Catholic Charities of New Orleans, Inc., (hereinafter the ACC) is a non-profit, religious oriented, multi-purpose charitable organization incorporated under the laws of the State of Louisiana on July 13, 1938. *80 It is a qualified charitable organization under section 170(c). Among the purposes for which the ACC was organized are the following: (12) To investigate and handle all worthy welfare cases involving Catholic families which may come under its observation; and, likewise, to investigate and handle all worthy cases wherein dependent, uncared for, abandoned, defective or delinquent Catholic children or foundlings may be involved. (13) To establish, maintain and operate homes for dependent, uncared for, abandoned, defective and delinquent children and foundlings, and, where possible, to place any of said children in homes where the family influence will be helpful. (14) To receive the custody of or to act as the tutors for dependent, uncared for, abandoned, defective and delinquent children and foundlings to the fullest extent, from time to time, allowed by law. (15) To transfer the custody of any child of which it may have custody, from time to time, to any one (person or persons; or Institution or Institutions); to consent to the adoption of any said child; to sign any Act of Adoption or to appear in any Proceeding for the purpose of completing the adoption, in a legal manner, *81 of any child of which it may have custody, from time to time. [Article II of Articles of Incorporation] The services and programs provided by the ACC included day care programs, foster home programs, programs for the elderly, maternity programs and adoption services. The adoption services agency of the ACC (hereinafter the Agency) is generally responsible for providing the totality of services required for adoptions. Services offered the biological mother include prenatal medical and residential care, maternity services, and counseling, especially with respect to the decision whether to surrender the child for adoption. The Agency provides medical and pediatric care for the child at birth. In addition, the Agency is responsible for the child's care from the time the child is surrendered to the Agency by the biological mother (usually shortly after birth) until placement with the adoptive parents. The Agency also performed the preplacement investigation and evaluation of the potential adoptive parents' ability to provide a proper environment for the child, and supplied postplacement supervision pending finalization of the legal adoption process. Counseling services regarding *82 the adoption of children were also provided by the Agency to those qualifying as adoptive parents. During 1972, it was the policy of the adoption agency to receive a total of $500 from prospective adoptive parents prior to the placement of a child in their home. The $500 was payable in two installments. The first $25 was payable at the time the applicants had their initial interview with the representative of the adoption agency, and was for the purpose of beginning the home study investigation of the applicants. The remaining $475 was payable after the applicants were finally and formally approved as eligible adoptive parents for the placement of a child in their home. Payments by prospective adoptive parents were ordinarily made directly to the ACC, not the adoption agency. These moneys would be placed in the general operating fund of the ACC, and used by it to finance the various services it provided, including those provided by the adoption agency. The ACC maintains records which identify the source and receipt of adoption-related payments (including any individual balance due). However, the accounting procedures used do not apply any of these payments to specific services *83 provided by the adoption agency. The general funds of the ACC are derived primarily from the United Fund, from the Archdiocese, from contributions to the ACC, and from fees for services that the ACC might charge. On June 2, 1971, the petitioners first applied to the Agency for the purpose of adopting a child. Their initial interview with an Agency representative was held on January 6, 1972, at which time petitioners paid their application fee of $25. Petitioners were formally approved as eligible adoptive parents on April 25, 1972, and paid the remaining $475 to the ACC on May 9, 1972. On December 14, 1972, the Agency placed an infant female in the home of petitioners, and the child was legally adopted by petitioners on September 5, 1973. On their joint Federal income tax return for the year 1972, the petitioners deducted as a charitable contribution the $500 paid to the ACC during 1972, labeling the amount as an "adoption fee." Respondent disallowed the entire amount of the claimed charitable contribution on the ground that such payment represented a fee for services rendered by the ACC rather than a charitable contribution, and as such constituted a personal expense the *84 deduction of which is not allowed under section 262. OPINION The only question for decision is whether $475 [2] paid to the ACC, a qualified charitable organization, during 1972 constituted a charitable contribution within the meaning of section 170(c)(2). [3]
*85 Petitioners argue that their $475 payment to the ACC constituted a charitable contribution deductible under section 170 because it was a "free-will gift" to a qualified charitable organization without designation or earmarking as to any specific uses that could be made of the payment. Petitioners also argue that no economic benefit accrued to them from the ACC by virtue of this payment. Respondent, on the other hand, contends that the payment was made to the ACC in exchange for the Agency's adoption services and was therefore not a charitable contribution. Section 170 allows as a deduction any charitable contribution, the payment of which is made during the taxable year. The meaning of the term "charitable contribution" for purposes of section 170 is set forth in this Court's opinion in DeJong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962): As used in this section the term "charitable contribution" is synonymous with the word "gift." * * * A gift is generally defined as a voluntary transfer of property by the owner to another *86 without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift. * * * It follows, therefore, that not every payment to an organization which qualifies as a charity is a charitable contribution. See, e.g., Murphy v. Commissioner,54 T.C. 249 (1970); Estate of Wood v. Commissioner,39 T.C. 1 (1962); DeJong v. Commissioner,supra; and McMillan v. Commissioner,31 T.C. 1143 (1959). However, it is recognized that a gift to charity may be combined with a payment in exchange for consideration flowing to the contributor, and in such a situation a deduction may be allowable to the extent the amount "contributed" exceeds the fair market value of any material benefit received in return. See Seed v. Commissioner,57 T.C. 265, 278 (1971); Murphy v. Commissioner,supra.Consequently, to prevail petitioners must show that the amount paid in 1972 to the ACC exceeded the value of the services rendered by the adoption agency and that *87 any such excess was intended as a gift. This they have failed to do. We first consider the petitioners' motivation with respect to the $475 payment to the ACC. Petitioners claim that the $475 payment was made without designation or earmarking as to the specific uses that could be made of the payment, and without expectation of the receipt of any specific direct economic benefit that was within the power of the ACC to bestow upon the petitioners, either directly or indirectly. Therefore, petitioners submit, they possessed the requisite intent to satisfy the generally recognized standards for charitable giving, citing DeJong v. Commissioner,supra, and Stubbs v. United States,428 F.2d 885 (9th Cir. 1970), cert. denied 400 U.S. 1009 (1971). The essence of this argument is that it is unrealistic to envision the adoption of a child by petitioners as economically benefitting the petitioners, and that any emotional or spiritual benefit accruing to the adoptive parents by virtue of a child's placement in their home is not the kind of benefit whose anticipation defeats the requisite statutory intention. On the basis of the entire *88 record, we conclude that the $475 transfer at issue was not made with the motivation required for a charitable contribution by section 170 and as described in DeJong v. Commissioner,supra.The expectation of a direct tangible benefit of an economic nature by the petitioner is not an absolute prerequisite to the existence of a disqualifying motive. A payment is not a gift if it proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act. DeJong v. Commissioner,supra,36 T.C. at 899. Even if the requisite charitable intent were only surrendered by the anticipation of an economic benefit, we find that petitioners herein anticipated economic benefits in the form of the placement services provided by the adoption agency, as distinguished from the adoption of a child, sufficient to satisfy an economic benefit test. Given the circumstances surrounding the relationship of petitioners to the adoption agency, it is clear that the $475 payment was not regarded by the *89 Agency as a contribution, but, instead, was a charge for its services, intended to cover part of the cost of operating the adoption services agency. We also note that the $475 was payable after petitioners were approved as qualified adoptive parents, indicative of the existence of a substantial likelihood for the placement of a child in the petitioners' home by the Agency. This fact undermines the significance of testimony by petitioner Henry L. Arceneaux, Jr., regarding his belief that the $475 was not refundable in the event no child was placed in petitioners' home. For the above reasons, we find that the $475 payment was made in anticipation of and in exchange for the services of the Agency. Petitioners also argue that the value of the services rendered to them by the ACC did not exceed $25, the initial application fee, and the remaining $475 is therefore deductible as a charitable contribution. They contend that, excepting the home study investigation allegedly valued at $25, any and all services performed by the Agency benefitted either the child or the biological mother, with any benefit to the adoptive parents being merely incidental and inconsequential. [4] This argument *90 is premised upon petitioners equating the failure of the ACC to maintain an accounting system correlating the costs of services performed by the Agency with revenues thereby generated to the absence of any benefit to petitioners. We cannot accept this argument. The fact that the accounting system employed by the ACC is an inadequate source of information regarding the costs of services supplied by the adoption agency does not mean that petitioners received no material benefit from the Agency. Rather, the record herein shows that the $475 payment made by petitioners to the ACC was in substance and operational *91 effect an adoption fee, given in exchange for the Agency's services which were indispensable to the petitioners' adoption of the child placed with them. These services constituted a return benefit or consideration accruing to the petitioners. See Murphy v. Commissioner,54 T.C. 249 (1970); McMillan v. Commissioner,31 T.C. 1143 (1959). The best estimate of their value on this record is the amount charged by the Agency. Accordingly, we hold that petitioners have not sustained their burden of proving that they are entitled to deduct the amounts paid to the adoption agency in 1972 as a charitable contribution. Decision will be entered under Rule 155. Footnotes
1. All section references herein are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.↩
2. Petitioners on brief apparently concede the nondeductibility of the $25 payment to the ACC made on January 6, 1972. ↩
3. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) ALLOWANCE OF DEDUCTION.-- (1) GENERAL RULE.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. * * *
(c) CHARITABLE CONTRIBUTION DEFINED.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * *
(2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.↩
4. Petitioners argue that the Articles of Incorporation for the ACC do not authorize the performance of services for adoptive parents, such that any resulting benefit accruing to them is incidental and inconsequential. However, there is nothing in these Articles which would prevent the ACC from serving Catholic married couples generally, or adoptive parents in particular. Furthermore, it would appear that the services offered by the adoption agency are necessary and proper activities in furtherance of the authorized purposes. See La. Rev. Stat. Ann. sec. 12.207↩ (West).