AMERICAN BAR ENDOWMENT, Frederick D. Turner et ux., Arthur M. Sherwood et ux., Frederick G. Boynton and Herbert C. Broadfoot, II et ux., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 465–82T, 163–83T, 190–83T, 320–83T and 351–83T.

United States Claims Court.

Jan. 31, 1984.

and Jeremy L. Nowak, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

These consolidated cases present questions relating to the operation of group insurance plans by the American Bar Endowment (ABE), a tax-exempt charitable organization. In No. 465–82T, the question is whether operation of the plans is a trade or business and therefore subject to the Unrelated Business Income Tax (UBIT), 26 U.S.C. §§ 511–513 (1976 & Supp. V 1981), or a fundraising activity and therefore not taxable. In Nos. 163–83T, 190–83T, 320–83T and 351–83T, the question is whether the individual plaintiffs are entitled to a charitable contribution deduction for dividends that were paid by the insurance companies under the ABE group plans and retained by ABE.

### Facts [1]

#### A. *HISTORICAL BACKGROUND*

The American Bar Endowment is a charitable organization exempt from taxation under 26 U.S.C. § 501(c)(3) (1976). Its charitable purposes are to promote legal research and education in order to advance the administration of justice and the science of jurisprudence. The Endowment accomplishes its purposes by making grants and is the primary supporter of projects undertaken by the American Bar Foundation, the research arm of the American Bar Association. While all members of the ABA are automatically members of the Endowment, the Endowment is a separate legal entity.

The ABE was established in 1942, and ABA/ABE members were encouraged to contribute to it through gifts and bequests. By the early 1950's, however, it became clear that sporadic individual donations would not permit the Endowment to fulfill its objectives. To remedy this situation, a fundraising plan was proposed based upon

Francis M. Gregory, Washington, D.C., with whom were Randolph W. Thrower, Atlanta, Ga., Sheila J. Carpenter, Barbara J. Groves and Sutherland, Asbill & Brennan, Washington, D.C., for plaintiffs.

Michael J. Dennis, Washington, D.C., with whom were Acting Asst. Atty. Gens. B. John Williams, Jr., Gilbert W. Rubloff, Robert C. Markham, Charles M. Watkins

---

1. The court made oral findings of fact on the record after trial. This opinion supplements those findings as appropriate to the resolution of the legal issues discussed.

the sale of group life insurance. Under this plan, the Endowment would make insurance available to its members at group rates. To participate in the plan, members would have to assign to the ABE any dividends or experience credits earned under the insurance policies.[2] The ABE group life insurance plan went into effect on June 1, 1955, with fewer than 12,000 subscribers.

From its modest beginnings, the ABE group insurance program has grown in size and importance. Over the years, the types of insurance and amount of coverage have increased, as have the insurance-related services performed by the Endowment staff. By the late 1970's and early 1980's, the period here in issue,[3] over 55,000 ABE members participated in the program, which was managed by a staff of about 40. Term life insurance of up to $150,000 was available, as was coverage for accidental death/dismemberment, major medical, in-hospital indemnity and disability income. Some insurance was also available for dependents under most of these policies.

During the years in issue, ABE's insurance program was underwritten by two companies, New York Life Insurance Co. (life programs) and Mutual of Omaha Insurance Co. (other programs). The Endowment employed James Group Service, Inc., a broker licensed by the state of Illinois, in connection with the purchase of insurance. The broker earned as commission a small percentage of all premiums. The commission was paid by the insurance companies but was in fact negotiated by ABE.

## B. *THE INSURANCE PROGRAM*

### 1. *The Endowment's Strategy*

All of the insurance plans offered by ABE are of the participating type. Participating insurance offers the possibility that dividends or experience credits (hereinafter collectively "dividends") may be refunded

to the insured at the end of each year. Whether dividends are paid in a given year depends upon two factors: the size of the premium initially collected (the initial or gross premium) and the costs incurred by the insurance company during the preceding year (principally with respect to the payment of claims). The larger the initial premium, the larger the expected dividend; similarly, the more favorable the claims experience, the larger the dividend.

Over the years, the Endowment sought to maximize the dividends received under the various insurance plans. It pursued this strategy by encouraging the insurance companies to set initial premiums as high as possible and by attempting to secure the lowest cost structure in the computation of dividends.

**a. Maximizing Premiums.** Setting the gross premium charged ABE members was technically the prerogative of the insurance companies. However, the companies always consulted with the Endowment, whose leadership had a significant role in determining premium rates. In general, the Endowment's leadership favored large initial premiums which could be expected to generate large dividends. The insurance companies generally favored lower gross premiums in order to attract the most participants.

While the Endowment sought to set gross premiums high, it did not do so blindly. The Endowment was aware that the level of premiums charged could affect participation in the insurance programs. It therefore set premiums so as to maximize the total volume of dividends collected. This meant that gross premiums were set with reference to the rates for other insurance products available in the market.[4] In pursuit of this policy, Endowment staff reviewed other insurance products available to ABE members and compared them to those offered by the Endowment.

---

**2.** Dividends or experience credits are portions of a year's premium that are refunded by the insurance company in light of its claims experience and other expenses. The concept is discussed at greater length below. *See* p. 406 *infra.*

**3.** The tax years in issue are 1979, 1980 and 1981. Because the Endowment's tax year begins on July 1, the period in question in No. 465–82T is July 1, 1978, to June 30, 1981.

**4.** Premiums, particularly for life insurance, were generally most competitive at younger ages and least competitive at older ages. This reflected two considerations. First, there was significant concern with bringing younger members into the insurance program. Once in the program, members would be likely to continue participation (even when premium rates became less competitive) because of inertia or because they might be precluded from obtaining

Where appropriate, adjustments were made to keep the cost of ABE insurance more or less competitive. However, premiums were never set so as to make ABE insurance the best deal. Because of the low costs associated with ABE insurance, premiums could have been set much, much lower if maximizing participation had been the principal objective. It was the Endowment's policy, however, to operate only those insurance plans capable of generating substantial dividends in the long run.

**b. Minimizing Costs.** In addition to keeping premiums high, the Endowment did much to keep the costs attributable to Endowment insurance plans low. The most significant factor in lowering costs was to cause the insurance companies to compute net premiums on the basis of the most favorable risk ratings. Because the method for determining such ratings is important to various aspects of the case, it warrants discussion.

Insurance premiums for individual (non-group) insurance are based on a person's life expectancy (mortality) for life insurance and expectancy of illness (morbidity) for health and disability insurance. These expectancies are derived from statistical tables that provide accurate information for the entire population but can only serve as approximations for any one individual. Characteristics such as present health, tobacco use or occupation have a significant bearing on the likelihood that a person will die or become disabled. Insurance companies therefore attempt to discover these factors in order to make an appropriate premium adjustment or to deny coverage altogether.

Screening these risk factors can be time consuming and costly, and may require detailed questionnaires and medical examinations. The more exacting the process, the more likely that the premium charged will reflect the risk incurred. However, as the screening process becomes more difficult, it also becomes more expensive for the company and more discouraging to applicants. Insurance companies therefore try to identify applicants with better than average life or health expectancy through methods that minimize or eliminate individual screening.

One such method is to identify groups whose members have more favorable mortality or morbidity statistics than the general population. Professional associations are prime examples of such groups. Members of professional associations are generally better educated than the population as a whole and more likely to be well nourished and have access to first-rate medical care. Professional associations also generally consist of members of a single profession, excluding individuals with more hazardous occupations.

While mortality and morbidity tables geared to a particular profession provide a better approximation of risks than tables geared to the population at large, the experience of a particular group within a profession may differ from the experience of the profession as a whole. Under certain circumstances, it is possible for an insurance company to arrive at a still more precise measurement of risks by providing insurance based on the experience of the group itself. This can only be done with a group that is large enough to provide a statistically meaningful experience that is not likely to fluctuate greatly from year to year. When an insurance company sets rates for a group on the basis of that group's own experience, that insurance plan is deemed to be experience rated. By further lowering costs, experience rating provides significant advantages in calculating dividends for participating insurance plans.

An important cost advantage secured by the Endowment was to assure that the ABE insurance plans were experience rated. Because the mortality and morbidity experience for the group was more favorable than for the legal profession as a whole, the net cost of ABE insurance was lower than the net cost of insurance available through other bar associations. The Endowment was also able to secure additional advantages. For example, while it collected premiums from members semi-annually, it transmitted them to the insurance companies only once a year, gaining the benefit of the float on a portion of the premiums. As to one of the plans, it was able to avoid charges for a certain type of reserve by establishing an escrow account with its own securities to absorb the risk. In general, the Endowment leadership used

other insurance. Second, the ability and willingness to make charitable contributions was expected to increase with a member's age and concomitant rise in income. Older members were therefore more likely to stay in the program even though an increasing portion of their dividends was devoted to charity rather than the purchase of insurance.

the size and prestige of the ABE account to vigorously negotiate the most advantageous possible cost structure for each of the insurance plans.

This strategy of cutting costs and keeping gross premiums high has been fabulously successful. Over the 28 years that the insurance program has been in effect, the Endowment has netted an astounding $81.9 million in dividends, $63 million of which it has devoted to its charitable endeavors. It should be noted that not all Endowment insurance programs have been equally successful in raising revenues in every year. However, on an overall basis, the Endowment's strategy was successful and it is clear that any plan not expected to generate large dividends in the long run would have been discontinued regardless of its popularity.

### 2. *Individual participation*

Individual ABE members were well informed about the fundraising nature of the insurance program. Advertising and promotional materials clearly indicated that objective. As a condition for participating in any of the plans, members agreed to assign all premium refunds to the Endowment. Applications for insurance contained such an assignment immediately above the signature line.

Dividends were calculated by the insurance companies separately for each of the Endowment's five insurance plans. At the end of each year, the underwriter for each plan refunded to the Endowment that portion of the gross premiums exceeding the cost of servicing that plan. The Endowment kept the money and informed members participating in each plan what percentage of the total premiums had been refunded and used for charitable purposes. Many members then multiplied the stated percentage by the amount they had paid in premiums under that plan and deducted that amount from their income taxes as a charitable contribution. Each of the individual plaintiffs did so with respect to one or more of the insurance plans in one or more of the years in issue.

### Discussion

The court must determine whether the Endowment's activities amounted to a trade or business subject to the UBIT and whether the individual members are entitled to deduct a portion of their premiums as charitable contributions. Although these questions have some elements in common, they present separate issues and require separate legal analyses.

### A. *THE ENDOWMENT*

1. The Unrelated Business Income Tax, as its name suggests, is levied on the "unrelated business taxable income" of certain tax-exempt organizations. 26 U.S.C. § 511(a)(1) (1976). Unrelated business taxable income is defined as "the gross income derived by any organization from any unrelated trade or business." *Id.* § 512(a). "Trade or business" in turn is defined as "any activity which is carried on for the production of income *from the sale of goods or the performance of services.*" *Id.* § 513(c) (emphasis added).

When considering a tax-exempt organization that is a charity, the court must distinguish between those activities that constitute a trade or business and those that are merely fundraising. Over the years, charities have adopted fundraising schemes that are increasingly complex and sophisticated, relying on many business techniques. *See, e.g.,* Wingis, *Fund Raiser Profits From New Techniques,* Advertising Age, Jan. 17, 1983, at M–42; Shapiro, *Marketing for Nonprofit Organizations,* Harv.Bus.Rev., Sept.-Oct. 1973, at 123. Charitable activities are sometimes so similar to commercial transactions that it becomes very difficult to determine whether the organization is raising money "from the sale of goods or the performance of services" or whether the goods or services are provided merely as an incident to a fundraising activity.

Fortunately, the Court of Claims provided significant guidance on this issue in its well-reasoned opinion in *Disabled American Veterans v. United States,* 650 F.2d 1178, 227 Ct.Cl. 474 (1981). That case involved a charitable organization that en-

gaged in a variety of activities each of which provided revenues to the organization. The court held that some of the activities constituted a trade or business, and therefore produced income subject to the UBIT, while others were fundraising activities and not taxable. The test enunciated by the court in *Disabled American Veterans* is whether the activity in question is "operated in a competitive, commercial manner." *Id.* 650 F.2d 1178, 227 Ct.Cl. at 489. Operations not conducted in such a manner were deemed to be fundraising activities not subject to the UBIT.

 Whether an activity is operated in a competitive, commercial manner is a question of fact and turns upon the circumstances of each case. At bottom, the inquiry is whether the actions of the participants conform with normal assumptions about how people behave in a commercial context. If they do not, it may be because the participants are engaged in a charitable fundraising activity. *Disabled American Veterans* illustrates this point. Among the activities considered in that case was the sale of certain items such as books, maps, charts and wrist calendars. 650 F.2d 1178, 227 Ct.Cl. at 482–83. The court found that some of those items were sold by the charitable organization at prices close to their market value. As to those items, the activity was held to be a trade or business because the motivation of the buyers could be explained entirely in terms of a commercial transaction. Certain other items were sold at prices far in excess of their market value. As to those items, the court found that the sales activity was not a trade or business because the actions of the buyers could not be explained by reference to commercial motivations but only by an intent to participate in a charitable fundraising activity.

2. In determining whether the ABE insurance program was operated in a commercial manner it is appropriate to start

with the observation that the program was devised as a means for fundraising and has been so presented and perceived from its inception. When the program was first developed in the mid-1950's, professional association group insurance was virtually unheard of. The idea of offering coverage through voluntary group participation was a pioneering idea in the insurance industry, so much so that the Endowment had some difficulty finding an underwriter for the program. The availability of group insurance of various types has proliferated over the intervening three decades; in many instances group insurance plans have been operated and promoted for commercial purposes. It is significant, however, that the ABE did not develop its fundraising plan by copying or adapting commercial ventures but vice versa.

Despite the widespread commercialization of group insurance plans, the Endowment has stubbornly adhered to the original concept that its plans are exclusively for fundraising. Advertising and other promotional materials consistently referred to the use of dividends for the Endowment's charitable endeavors; the Endowment's annual reports discussed the insurance program as a source of charitable contributions; communications to policyholders consistently referred to the Endowment's retention of dividends as donations, not as profits. In short, both the ABE leadership and the insured members considered the insurance program a fundraising activity and treated it as such.[5]

It is, of course, inappropriate to give the perceptions and labels of the parties conclusive effect. However, it is also wrong to ignore these facts altogether. *Disabled American Veterans* requires a determination as to the motivation of the participants in the transaction. The manner in which the program was presented and perceived can be an important factor in that determi-

5. Even those ABE members who testified for the defendant appeared to share this view. While these witnesses disagreed with the manner in which the program was operated and would have preferred to pay lower premiums by terminating the program's fundraising function, they certainly never suggested that the Endowment was operating a business which was profiting at their expense.

nation. This is particularly so where, as here, the transaction is relatively unusual, defying ready classification, and the perception of the program as a fundraising activity has been held by many thousands of people for the better part of three decades.

Another significant factor is the staggering amount of money consistently generated by the Endowment's activities. In 1979, the Endowment collected $12.8 million in gross premiums and received about $5.1 million in dividends. Its expenses were less than $1.5 million. If this were a business, as defendant suggests, its profit margin would have been 240%. For 1980 and 1981 profit margins would have been over 400% and 260%. These margins were typical; over the years the Endowment has netted approximately 300% over expenses.

The evidence presented and common sense suggest that such profit margins cannot be maintained year after year in a competitive market. With one exception, no business involved in the underwriting, sale, brokering or administration of insurance has been able to earn profits even approaching this level. The exception involved sales of insurance to a captive market, a practice considered abusive and promptly subjected to regulation in many states.[6] Certainly no legitimate business has been able to match the astounding profitability of ABE's program, and no business (legitimate or otherwise) has been able to maintain that level of profit for any sustained period.

Yet another significant factor is the Endowment's candor toward its members and the public concerning the operation of the insurance programs and the revenues derived therefrom. ABE went to great lengths to publicize all relevant facts in annual reports, direct communications with insured members, promotional materials and other ways. As is typical of charitable fundraising campaigns, the ABE took great pride in letting the world know how much money was collected each year and the uses to which the money was put. This openness creates yet another contrast with normal perceptions of a business. Generally, business enterprises strive to keep their profit margins secret, particularly where those margins are inordinately high.

The final and most telling factor is that the insurance program was operated with the approval and consent of the ABA membership. The ABA consists of some 300,000 members who have the good fortune of belonging to a group with a very favorable mortality and morbidity rating. This is a valuable asset. Most professional associations (including almost all bar associations) operate such programs on a service-oriented basis and secure the most economical group insurance for their members. If the ABA had chosen to do this, it could have offered its members insurance at premiums lower than any other bar association, perhaps the lowest premiums of any group in the country. The ABA members, however, have chosen a more generous approach, allowing the Endowment (rather than the ABA) to operate the insurance program and retain the dividends. This approach is costly to the members who buy the insurance because they are required to pay much more than if the ABA were operating the program as a service. The program is also very costly to those members who do not participate in the ABE insurance plans because they are foreclosed from considering the cheaper insurance that would otherwise be available.[7] Yet, over the years there has

6. An example of this practice were lenders who sold credit insurance to people applying for loans. The granting of the loan was conditioned on the purchase of insurance. This put significant pressure on the borrower, enabling the lender to charge exorbitant rates for the insurance.

7. The money that could have been saved by the members who bought insurance was equal to the dividends refunded minus the Endowment's operating expenses. This amounted to several million dollars a year. See pp. 407–08 supra. Only about one-sixth of the members bought any insurance, however, and few of those took advantage of all the programs available. The cost to the nonparticipating members, many of whom had to buy more expensive insurance elsewhere, is not so easily quantifiable but could be many times greater than the losses suffered by the insured members.

been surprisingly little dissent. While a handful of members have voiced a preference for lower-priced insurance, there has never been any organized effort to change the existing policy.

Defendant suggests that ABA/ABE members have no control over the way the insurance programs are operated because the programs are maintained in their present form by an unresponsive leadership. The court finds to the contrary. In the first place, there is nothing to suggest that the ABA/ABE leadership is unresponsive to the wishes of the members they represent. While support for the current method of operating the programs is strong among ABA/ABE officials, this appears to be in great part a reflection of the membership's view. If the ABA/ABE leadership determined that a majority of the members wanted a change, there is every reason to believe that the leadership would take appropriate steps to implement it.[8] Moreover, even if one were to assume that the ABA/ABE leadership is unresponsive, it is not at all clear that it could stifle a grassroots movement to change the method of operating the insurance programs. Plaintiff has demonstrated to the court's satisfaction that there are ample, effective channels within the ABA for members to make their views known and have them implemented.[9]

When taken together, these factors make it impossible to conclude that the insurance programs were operated by ABE in a competitive, commercial manner. The Endowment raised huge sums of money by its activities, sums wholly unrelated to the value of any service it provided and which dwarfed the profit margins of insurance-re-

lated businesses. It disclosed the relevant facts to its members at every available opportunity, yet the members (who bore the economic cost of this program) allowed the practice to continue although they collectively had the power to change it. No business could operate in this fashion. Supermarkets would go broke if shoppers could approve prices; airlines would never leave the ground if passengers could decide what the fares should be; automobile rental companies would be driven out of business if customers could set the rates. By the same token, neither consumers nor the competitive marketplace long tolerate business enterprises that make huge profits without delivering commensurate value in return. *See, e.g.,* p. 410 & n. 6 *supra.* One would have to assume that ABA/ABE members have been subject to an epidemic of irrationality in permitting themselves to be bilked in this manner for almost three decades. The far more reasonable explanation is that the members are entirely rational and are permitting the ABE to collect such substantial revenues at their expense because they consider the Endowment to be engaged in fundraising, which they support. By any standard, an enterprise that depends on the consent of its customers for its profits is not operating in a commercial manner and is not a trade or business.

This conclusion is supported by the language of the statute. The amount of money ABE is permitted to retain far exceeds the value of any service it may be providing through the operation of the insurance programs. It is quite obvious, then, that this money was not earned "from the sale of goods or the performance of services," 26 U.S.C. § 513(c) (1976), but for some other

---

8. If the insurance programs were to be operated in a service-oriented fashion, it might be necessary to withdraw them from the ABE and have the ABA operate them directly. *See* Treas.Reg. § 1.501(c)(3)–1(c)(1) (1959).

9. For an instructive illustration of how an attorney organization can override a decision made by its leadership see, *D.C. Bar Petitions Court to Increase Dues Ceiling,* B.Rep., Mar. 1980, at 1–12; *The Referenda are Coming,* B.Rep., Oct.–Nov. 1980, at 1–9; and *Referen-*

*dum Results Tabulated; Board of Governors Submits Material to D.C. Court of Appeals,* District Lawyer; Jan.–Feb. 1981, at 20, 50–60. These articles chronicle the successful efforts of the D.C. Bar's rank and file to limit dues increases proposed by the leadership and to restrict the bar's functions in contravention of the leadership's wishes. Defendant has suggested no reason why the ABA members could not equally well overcome any intransigence on the part of the ABA leadership.

reason. That reason was the intent of the members to support the Endowment's charitable activities.

■ 3. Defendant argues that the Endowment's activities must be deemed a business under *Disabled American Veterans* because the rates it set for insurance were within the competitive range in the market. Defendant reads *Disabled American Veterans* far too narrowly.[10]

Nothing in *Disabled American Veterans* suggests that price disparity is the only factor the court may consider in differentiating a fund-raising activity from a business. The broad teaching of *Disabled American Veterans* is that the court should compare the operation of the activity in question with normal business practices to determine whether the enterprise is being run in a commercial fashion. If an aspect of the operation appears inconsistent with normal business practices and the difference can only be explained by an intent to benefit a charity, the enterprise may well be a fundraising activity and not a business. Here, the fundraising activity is operated so differently from that in *Disabled American Veterans* that the comparison of the rates charged with others available in the market proves not to be a decisive factor. The premise of a business transaction is negated by the fact that ABA/ABE members as a group have permitted the Endowment to collect exorbitant revenues when they could easily deny it *any* income if they so desired.

■ Equally unavailing is defendant's argument that the Endowment's professional marketing and efficient administration of the insurance programs renders the activity a trade or business. Defendant's own expert economist testified that good organization and effective advertising does not distinguish a charitable enterprise from a commercial one. Fundraising, like any other activity, depends upon sound organization for success. *See generally* Shapiro, *Market-*

*ing for Nonprofit Organizations,* Harv.Bus. Rev., Sept.-Oct. 1973, at 123. Promotion in particular has become a recognized and important aspect of modern fundraising. Once the ABA/ABE members allow the Endowment to raise funds through the operation of the insurance program, the organization must do whatever is necessary to maximize the revenues derived therefrom. The Endowment's leadership would be remiss if it did less. It would be entirely inappropriate for ABA members to give up the opportunity to obtain the lowest group rates and then have the benefits of their generosity squandered because the Endowment did not do what was required to maximize the amount raised for charitable purposes.

4. Defendant cites a number of recent decisions holding that operation or sponsorship of insurance programs by tax-exempt organizations constitutes a trade or business. *See Carolinas Farm & Power Equipment Dealers Association v. United States,* 699 F.2d 167 (4th Cir.1983); *Louisiana Credit Union League v. United States,* 693 F.2d 525 (5th Cir.1982); *Professional Insurance Agents v. Commissioner,* 78 T.C. 246 (1982). *See also Long Island Gasoline Retailers Association v. Commissioner,* 43 T.C.M. (CCH) 815 (1982) (issue conceded by petitioner). These cases are not on point.

The organizations sponsoring the insurance programs in each of those cases were business leagues exempt from taxation under section 501(c)(6); ABE is a charitable organization exempt under section 501(c)(3). Business leagues are not charities as that term is generally understood; they are operated to promote the parochial interests of their members, not those of the public at large. Such organizations provide a variety of services to their members, generally financed through dues or other direct contributions. Payments to such organizations have a business purpose and are not chari-

---

10. The record does not, in any case, fully support defendant's factual contention. As will be discussed more fully below, *see* pp. 415–16 *infra,* it is impossible to isolate a single market for insurance. The cost of insurance depends

on a variety of factors, many of them individual to each buyer. Thus, while ABE insurance may have been within the competitive range for some potential buyers it was not for others.

table in nature. Congress has recognized this by providing that payments to 501(c)(6) organizations may not be deducted from gross income as charitable contributions, while those to 501(c)(3) organizations may. 26 U.S.C.A. § 170(c) (West 1978 & Supp. 1983). At the same time, dues payable to 501(c)(6) organizations are generally deductible as business expenses. *See Smith-Bridgman & Co. v. Commissioner*, 16 T.C. 287, 295 (1951).

■ When dealing with trade associations or business leagues, therefore, the analysis of *Disabled American Veterans* is simply inapposite. Once it is shown that a 501(c)(6) organization is engaging in an income-producing enterprise, the activity must perforce be deemed a business because such organizations do not engage in charitable fundraising. By contrast, fundraising is an important and frequently continuous process for charitable organizations. *Disabled American Veterans* recognized, however, that there is sometimes a very thin line between fundraising and business activity. The court must therefore engage in a sensitive analysis of the relevant factors to determine the precise nature of the venture. Such weighing only becomes relevant if the organization is one for which fundraising is a possibility; the analysis of *Disabled American Veterans* has no bearing to the issues presented in *Carolinas Farm, Louisiana Credit Union League* and *Professional Insurance Agents.*

The cases cited by defendant are also distinguishable factually. In each case the organization was paid a fixed percentage of the premiums collected, ranging from 2½ to 8%. These percentages, which are well within the range normally paid for those types of promotional and administrative services, stand in stark contrast to the 40, 50 and even 90% of premiums regularly refunded as dividends and retained by ABE. Moreover, none of the cited cases suggest that members were fully informed of the arrangement with the insurance com-

pany and permitted it to continue even though it caused them a monetary loss. In at least one case the court found to the contrary. *Professional Insurance Agents,* 78 T.C. at 251–52. In short, each of the cases cited discloses a situation where the insurance plans and related activities were conducted precisely as one would expect a business to operate.[11] Therefore, even if the test enunciated in *Disabled American Veterans* were applicable to 501(c)(6) organizations—which the court believes it is not—there would be no inconsistency between the results reached here and those reached in the cases cited by defendant.

■ 5. Because this case presents an unusual fact situation, not squarely controlled by either the language of the statute or by case precedent, it is appropriate to consider the legislative history of the UBIT to determine whether the arrangements here run afoul of the congressional purposes in imposing the tax. Since the Court of Claims analyzed the legislative history of the UBIT in *Disabled American Veterans*, 650 F.2d 1178, 227 Ct.Cl. at 478–79, there is no reason for doing so again. It is sufficient to note that, based upon its examination, the court found as follows:

> The legislative history of sections 511–13 demonstrates that Congress perceived the tax-free operation of an unrelated trade or business by an exempt organization to provide an unfair advantage over competitors. The primary purpose for subjecting unrelated business income to taxation was to remove this unfair competitive edge.

*Id.* at 1181, 227 Ct.Cl. at 479 (footnote omitted). The court must therefore determine whether the ABE's activities have an anticompetitive effect or otherwise place tax-paying enterprises at an unfair disadvantage.

In attempting this analysis one encounters the problem of determining in what market ABE was operating and who its potential competitors were. This differs

---

11. The court in *Carolinas Farm* specifically so found, reserving the question of whether it would have reached a different result if the

organization had not been operating in a commercial manner. 699 F.2d at 170 n. 5.

from many cases involving the UBIT where effects upon competition can be readily ascertained. *See, e.g., Carle Foundation v. United States,* 611 F.2d 1192 (7th Cir.1979), *cert. denied,* 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980) (sale of pharmaceuticals); *Cooper Tire & Rubber Co. Employees' Retirement Fund v. United States,* 306 F.2d 20 (6th Cir.1962) (leasing of tire manufacturing equipment); *American College of Physicians v. United States,* 3 Cl.Ct. 531, *appeal docketed,* No. 84–715 (Fed.Cir. Dec. 20, 1983) (publication of advertising); Rev. Rul. 79–361, 1979–2 C.B. 237 (operation of miniature golf course); Rev.Rul. 55–449, 1955–2 C.B. 599 (construction and sale of houses). It is also not without significance that for 21 years the Internal Revenue Service took the position that ABE's operation of the insurance program was not taxable. *See* I.R.S. Letter Ruling 8042012 (July 3, 1980) (citing unpublished technical advice memorandum of January 31, 1973, that concluded ABE's insurance program was not a business). This suggests that whatever UBIT policies the ABE's activities are thought to implicate must be subtle indeed.

The Endowment was not in the business of underwriting insurance; this function was performed by two large insurance companies, New York Life and Mutual of Omaha. Moreover, when viewed from the perspective of insurance carriers, the ABE's activities were procompetitive. As previously noted, there was a constant tension between the Endowment, which wanted to set premiums high to maximize dividends, and the underwriters, which wanted to keep the premiums low to attract more members into the program. By keeping premiums high, the Endowment diminished the amount of business flowing to the two underwriters from ABE members, presumably dispersing that business to other insurance companies. Had the program been operated entirely as a service, offering the lowest possible rates, many more members would have joined the program and there would have been greater concentration of business in the two insurance carriers.

The Endowment does, of course, act as an intermediary between its members and the insurance companies. Yet, given the characteristics of group insurance, there can be just one such intermediary. The only way in which ABA members could take advantage of the benefits of group membership (either for themselves or for charitable purposes) was to have an intermediary negotiate the best possible deal for the group as a whole. ABE performed that function and there could be no second such intermediary acting for the group as a whole. To be sure, there were others competing for the opportunity to act as intermediaries for individual members of the ABE. These intermediaries would not, however, be in direct competition with the ABE for the business of the group as a whole. In any case, ABE's insistence on large dividends, which generated the income the government now wants to tax, increased the competitive advantage of these other intermediaries. Over 80% of ABE members bought no insurance through the Endowment, most of them presumably obtaining insurance through other intermediaries. A change in ABA's policy that would make the insurance available to members at the lowest possible group rates would drain much business from these other intermediaries.

The absence of any identifiable business over which the ABE is able to gain an unfair advantage supports the conclusion that its activities are not commercial and therefore not a business. At the very least, it suggests that nothing in the policies underlying the UBIT requires that the Endowment's activities be taxed. Indeed, it appears that the Endowment's activities have an entirely procompetitive effect, fully consistent with the policies of the UBIT. The congressional purpose behind the statute would therefore not be served by holding that the Endowment was engaging in a business activity by operating the insurance program.

### B. *THE INDIVIDUAL PLAINTIFFS*

The plaintiffs in Nos. 163–83T, 190–83T, 320–83T and 351–83T are ABE members and their wives. Each member has participated in one or more of the ABE insurance

plans and has taken a charitable deduction for dividends refunded on his behalf by the insurance companies but retained by the Endowment. Plaintiffs claim a deduction on the theory that each payment to ABE constituted a dual payment: part for insurance and part as a contribution to the Endowment's charitable endeavors. They claim that the portion representing a charitable contribution is properly measured by the amount of the premium refunded as a dividend and retained by ABE. Defendant argues that the payments made by plaintiffs were entirely for insurance and that plaintiffs are therefore not entitled to a charitable contribution deduction for any portion of the payments.

### 1. *The Legal Standard*

It is well established that a payment can consist of two components, one that is commercial in nature and another that is a charitable donation. *See Singer Co. v. United States,* 449 F.2d 413, 196 Ct.Cl. 90, 109 (1971); *Oppewal v. Commissioner,* 468 F.2d 1000, 1002 (1st Cir.1972); *Arceneaux v. Commissioner,* 36 T.C.M. (CCH) 1461, 1464 (1977); *Murphy v. Commissioner,* 54 T.C. 249, 253 (1970); Rev.Rul. 68–432, 1968–2 C.B. 104. To establish a dual payment, the taxpayer must demonstrate that he bought goods or services for more than their economic value, with the intention that the excess be used to benefit a charitable enterprise. Rev.Rul. 67–246, 1967–2 C.B. 104, 105. A corollary to this rule is that there can be no dual payment where the entire amount paid by the taxpayer is economically motivated, that is, where the payment is made to obtain goods or services for which the taxpayer would be willing to pay the full price even absent the charitable contribution. *See, e.g., Arceneaux,* 36 T.C.M. (CCH) at 1464 (payment by adoptive parents to adoption agency not a contribution); *Werbianskyj v. Commissioner,* 34 T.C.M. (CCH) 467, 468 (1975) (payment for girl scout cookies not a contribution absent showing that price exceeded product's fair market value).

Normally, a determination of whether the payment for a good or service exceeds what the buyer would have been willing to pay in a purely commercial transaction is made by reference to the commodity's market value. Market value can be determined by various techniques, a preferred one being to compare market transactions for similar goods or services. *See, e.g.,* Rev.Rul. 80–233, 1980–2 C.B. 69. The valuation of insurance is more difficult. Unlike other types of goods or services that have more or less the same value regardless of who is the buyer, the cost of insurance varies drastically with the identity of the insured. Thus, for example, $100,000 of life insurance will (all other things being equal) be much less expensive for a healthy, 30-year old, nonsmoker of normal weight than for a 50-year old cigarette smoker who is obese and has a history of heart disease.

The value of insurance also turns on factors that are not specific to individual buyers. One important factor is whether the insurance policy is an individual one or part of a group plan. Group insurance frequently is limited as to the type and maximum amount of coverage available. The subscriber must also remain a member of the group to continue participation in the group policy. The terms of a group plan may be altered by the group without the consent of the individual insured. On the other hand, group plans frequently offer attractive rates. Group plans also generally provide some level of insurance without proof of insurability and additional levels of insurance with only a limited inquiry and without a physical examination.

Group plans offer attractive premiums for many people but they do not offer the lowest premiums for all members of the group. Because individual insurance coverage can be geared to a person's health status and other individual characteristics, people qualifying for preferred risk rates may be able to obtain individual insurance that is less expensive than group insurance. Individual insurance also provides the option of buying virtually unlimited coverage and tailoring a policy with such frills as waiver of premium, double indemnity and insuring

one's insurability. The benefits under an individual policy cannot be changed except pursuant to its terms or with the consent of the insured. In addition, individual policies are available not only as term insurance but also, in the case of life insurance, as whole life. Many insurance buyers find the forced-savings and safe-investment features of whole life insurance attractive. Group life insurance plans offer only term insurance.[12]

Another important factor to consider in valuing life insurance is the identity of the carrier. Some insurance companies are more reputable than others; some pay claims liberally while others are more conservative. Such differences influence buyers of insurance in the selection of their coverage. Geography also has an effect upon the price of insurance. For reasons that are not entirely clear, there is no national market for insurance; the availability and cost of insurance can vary significantly depending upon the place where the insured resides.

▆ To establish that a portion of the payment for ABE insurance is a charitable contribution, a plaintiff must show that an equivalent insurance product was available to him for a lower price[13] and that he bypassed that product because he wished to make a charitable contribution to the Endowment. A plaintiff's mere awareness that a portion of his payment would be devoted to charitable purposes is not sufficient to establish that he made a charitable contribution. Only if the plaintiff passed up an economically more attractive package in order to participate in the Endowment's

insurance program can the court find that there has been a dual payment.

Plaintiffs argue that such a painstaking inquiry for each insured member is inappropriate because the value of the insurance provided through the ABE was the net cost charged by the underwriter (the gross premium minus the dividend). They base this argument on the fact that ABE members can change the arrangement at any time, thereby depriving the Endowment of the dividends. See p. 410 supra. In plaintiffs' view, then, each member is entitled to deduct the dividend attributable to him because he has participated in the group decision permitting the Endowment to retain dividends and such participation establishes charitable intent. The court cannot accept this view. Whether the Endowment operates the insurance program as a service, as a business or as a fundraising activity is a group decision, determined by group processes; once made it is binding on all members, even those who disagree with it. The decision whether to buy insurance and/or whether to make a charitable contribution is an individual one. That the group as a whole could lower insurance rates is of little relevance to an individual member who must decide whether or not to participate in the insurance program as it is in fact structured.[14] For some ABE members the insurance offered through the Endowment is not a very good deal; they may choose to buy it anyway because they wish to contribute to the Endowment's activities. Other members might find the insurance to be a good value; they would buy the insurance regardless of whether they intended to make

---

12. While it is difficult to generalize, it is fair to say that group insurance is likely to be most attractive to people who prefer relatively small amounts of coverage, those who are subject to some risk which precludes them from obtaining individual insurance at preferred rates and those who prefer not to deal directly with insurance agents or be bothered with intrusive health questionnaires or medical examinations. All things being equal, however, a person eligible for both individual insurance and group insurance at the same price is likely to select the individual insurance because of the additional security and flexibility afforded by individual policies.

13. Seldom are two insurance plans identical. Any differences between the alternative insurance and that available through the Endowment would have to be factored into the valuation process.

14. Any consent to ABE's retention of the dividends that can be inferred from the fact that a member refrains from agitating for a change in ABA policies is simply too remote to establish a charitable intent.

a donation. Under the applicable law, these two groups must be treated differently. An individual inquiry must be conducted as to each member to determine to which group he belongs.

Plaintiffs point to the obvious mechanical difficulties in making these determinations on a case by case basis for the 55,000 or so ABE members who participate in one or more of the insurance plans every year. They urge the advantages of a unified approach such as that adopted by Congress in 26 U.S.C.A. § 79 (West 1967 & Supp.1983). Section 79(c) establishes uniform rates for employer funded group term life insurance. *See* Table 1 of Treas.Reg. § 1.79–3(d)(2) (1983). The simplified approach of section 79 deals with a specific problem Congress recognized and chose to address. While, here too, there might be much wisdom in avoiding individual adjudication of thousands of claims as to the value of insurance, it is up to Congress, or perhaps the Commissioner pursuant to his regulatory authority, to provide such a solution. This court can only decide the cases before it and must defer to those with broader authority to address problems of broader scope.

2. *Application to These Cases*

**No. 351–83T.** Plaintiff Herbert C. Broadfoot, II, carried ABE life insurance in the amount of $50,000. He testified that he was aware that a portion of his premium payment would go to the Endowment to support its charitable purposes. As indicated above, such knowledge is not sufficient to establish charitable intent. Nothing on the record suggests that similar insurance was available to plaintiff at a lower price and that he bypassed that opportunity in order to make a contribution to the Endowment. On the contrary, plaintiff testi-

fied that premiums for insurance offered by his state bar association were higher than for comparable ABE coverage. Since plaintiff failed to carry his burden, the court finds for the defendant.

**No. 320–83T.** Plaintiff Frederick G. Boynton participated in ABE's disability insurance program and was also aware that part of his premium would be used by the Endowment to support its charitable activities. The record discloses no information as to other available insurance and therefore does not support a finding that Mr. Boynton purchased ABE insurance for reasons other than his own economic interest. The court finds for defendant.[15]

**No. 163–83T.** Plaintiff Frederick D. Turner is enrolled in ABE's group life insurance program. Like the others, he indicated that he was aware of the charitable uses to which part of his payment would be put. Here again, however, plaintiff has failed to make the necessary showing and the court finds for defendant.

**No. 190–83T.** Plaintiff Arthur M. Sherwood presents the most interesting and difficult case. Mr. Sherwood participated in the ABE's life insurance program by buying insurance in the amount of $20,000.[16] He was also eligible to participate in the plan offered by the New York State Bar Association. For the three years here in issue, the insurance offered under that plan would have been cheaper for Mr. Sherwood. Moreover, the insurance offered under the New York State Bar Association plan was underwritten by the same insurance carrier as the ABE plan, making the two plans comparable.[17]

While this plaintiff, unlike the others, has established that a comparable product was available to him at a lower price, he did not

---

15. This plaintiff also presented an unrelated claim based on a $50 business deduction for his membership in Eastern Airlines' Ionosphere Club which provides lounges and other facilities at various airports. Plaintiff testified that he used these facilities to work while awaiting flights. After plaintiff testified, defendant conceded his entitlement to the deduction.

16. Mr. Sherwood also purchased dependent coverage through the ABE. Because the record is devoid of evidence on comparable rates for such insurance, the court finds for defendant on this point.

17. While the two plans were not identical, the differences were sufficiently minor that they could be ignored or eliminated through mathematical adjustments.

state that he was aware of the existence of this product during the years in issue and decided to purchase ABE insurance instead because he wanted to make a charitable contribution. The court therefore finds for the defendant.

### Conclusion

ABE's insurance program is not a trade or business taxable under the UBIT. None of the individual plaintiffs are eligible for a charitable contribution deduction on account of payments made to ABE for the purchase of insurance. Plaintiff in No. 320–83T is entitled to a business deduction for his payment to the Ionosphere Club.

No later than 12:30 p.m. on Thursday, February 2, 1984, the parties shall file a stipulation setting forth the amount of plaintiffs' judgment in Nos. 465–82T and 320–83T. Upon receipt of this stipulation, the clerk is directed to enter judgment in favor of plaintiffs in these two cases in the amounts stipulated and to dismiss the complaints in the other cases. If the parties are unable to file a stipulation, a status hearing will be held at 2:00 p.m. EST on February 2, 1984, in Courtroom No. 4, Fifth Floor, National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005.

The prevailing party in each case shall recover its costs. 28 U.S.C. § 2412(a) (Supp. V 1981); RUSCC 54(d). The plaintiff is the prevailing party in No. 465–82T and defendant is the prevailing party in Nos. 163–83T, 190–83T, 320–83T and 351–83T.