Coye C. MASON and Lois T. Mason, Plaintiffs-Appellees, Cross-Appellants,

v.

UNITED STATES of America, Defendant-Appellant, Cross-Appellee.

Nos. 74–1299, 74–1300.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1974.

Decided March 17, 1975.

James R. Thompson, U. S. Atty. and Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., Scott P. Crampton, Asst. Atty. Gen., Jonathan S. Cohen, Atty., Tax Div., Dept. of Justice, Washington, D. C., for United States.

Stuart Duhl, Chicago, Ill., for Mason.

Before CASTLE, Senior Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

Before 1969[1] taxpayer sold property to a charity for a stated price substantially equal to the fair market value of the property; the price was paid by the charity's delivery of a small amount of cash and an unsecured long-term promissory note in the amount of the balance. The market value of the note was substantially lower than its face amount. The questions presented by this appeal are (1) whether the taxpayer made a gift to the charity and, if so, (2) whether the benefit conferred on the charity is being returned to taxpayer as installments of principal, plus interest at the low rate specified in the note, are paid. We affirm the district court's judgment in favor of the taxpayer.[2]

The essential facts were determined by a jury's answers to special interrogatories. Taxpayer was one of three owners of a corporation operating a blood bank. His interest in the corporation had a market value of $117,000.[3] When the business was sold to a charity in 1966, taxpayer and another shareholder with a like interest each received $4,507.50 in cash and an unsecured note for $112,689.42, payable in 20 annual installments of principal plus interest at the rate of 4% per annum.[4] At the time of the sale, each note had a market value of $81,000.[5] Thus, in exchange for a capital asset worth $117,000, taxpayer

1. The Tax Reform Act of 1969 (Pub.L. 91–172) amended the charitable contribution deduction provisions of the Code to disallow deductions for the gift of partial interests in property, *see* § 170(f)(3)(A) of the Code. We need not consider whether taxpayer would have been entitled to a deduction had this transaction taken place after the effective date of this Act.

2. 365 F.Supp. 670 (N.D.Ill.1973).

3. The $117,000 figure represents 45% of $260,-000 the total value of the business as appraised by Southwest Blood Banks, an Arizona organization which was prepared to pay that amount in cash for the business (Tr. 72). Actually, taxpayer owned a fraction of a share more than 45% and, therefore, the portion of the total purchase price allotted to his shares was $117,196.92. The fact that the jury apparently rounded this figure off to an even $117,-000 gave rise to the modest original issue discount mentioned *infra* in n. 8.

4. The first paragraph of the note provided for a 10-year payout. However, the second paragraph provided that no default would occur so long as the obligor paid current interest and no less than 50% of the semiannual payments of principal. The net effect of the two paragraphs was to give the charity the right to extend the term of the note to 20 years. Although the note provided for a higher interest rate after "maturity," and although the date of the maturity is arguably only 10 years after issuance of the note, the appraiser who valued the note did not so construe it, and the government offered neither evidence nor argument in support of that construction in the district court. In these circumstances, we must accept the jury's special finding as adequately supported by the record.

5. The corporate executor of the estate of Dr. Grimm, the other principal selling shareholder, appraised the decedent's note as worth $80,-776.03. That valuation was accepted for Federal Estate and Illinois Inheritance Tax purposes. The discount (as compared with the face value of $112,689.42) was attributed to the low interest rate, the lack of security, and the credit standing of the obligor. The jury apparently rounded off the appraised value to an even $81,000, a figure slightly more favorable to the government. In any event, the government does not now challenge that figure for purposes of this appeal.

received consideration (including the cash as well as the note) worth $85,-507.50. Was the difference of $31,492.50 a gift?

The Commissioner disallowed the deduction claimed by taxpayer on his 1966 return; taxpayer paid the deficiency plus interest, and then commenced this refund suit. The issues in the district court were quite different from those presented to us. The factual issues, determined by the jury, were (1) the value of the asset which taxpayer sold; (2) the value of the promissory note which taxpayer received; and (3) whether taxpayer intended to make a gift to the charity. The government apparently did not question taxpayer's entitlement to a deduction for a charitable contribution under his version of the facts.[6] As a matter of law, however, the government argued on alternative theories that taxpayer's gross profit on the sale was taxable as ordinary income rather than capital gain. First, the government contended that capital gains treatment was permissible only to the extent of the difference between taxpayer's basis and the market value of the note;[7] second, the government argued that the difference between the face value and the actual value of the note was "original issue discount."[8] Neither of these contentions is pursued here; instead, the government now argues that if taxpayer did make a gift to the charity, the benefit originally conferred is being returned pro tanto as each installment of principal is paid and, therefore, the receipt of the payments should be treated as ordinary income under the so-called "tax benefit rule." See Southwestern Illinois Coal Corp. v. United States, 491 F.2d 1337, 1339 (7th Cir. 1974).

We first consider the government's objections to taxpayer's charitable contribution deduction and then its argument that a fraction of each installment payment is a partial restoration of the donated property.

I.

The government does not dispute the proposition that a bargain sale may constitute a gift. See, e. g., Singer Co. v. United States, 449 F.2d 413, 418, 196 Ct.Cl. 90 (1971). Nor does the government expressly argue that the jury's finding that taxpayer intended to make a gift is unsupported by the evidence.[9]

---

**6.** After the jury returned its verdict resolving the factual issues, the legal issues were presented to the court by cross motions for summary judgment filed by the respective parties. In its opinion disposing of those motions, the district court stated: "The Government admits [taxpayer] was entitled to the charitable deduction." 365 F.Supp. at 675.

**7.** The district court held that § 453(b) of the Internal Revenue Code required use of the face amount of the note to compute taxpayer's capital gain, and that § 1001(b) was inapplicable to an installment sale. See 365 F.Supp. at 672–674.

**8.** "Original issue discount typically arises where an issuer sells its debt obligation on the market for *cash* at a price less than the face amount of the obligation." Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 143, 94 S.Ct. 2129, 2134, 40 L.Ed.2d 717 (emphasis in original). In this case, if the government had persuaded the jury that the market value of taxpayer's interest in the blood bank was about equal to the market value of the note, then the difference

between that value and the face amount of the obligation could represent original issue discount. However, as the facts were found by the jury, the only such discount that could result was the amount of $196.92, obviously produced by the rounding off process. The government does not press the original issue discount argument in this court.

**9.** There is ample evidence to support the finding that taxpayer intended to make a gift to the charity. Although the government disputed the valuation issues in the district court, for purposes of appeal it acknowledges that the property which taxpayer transferred to the charity was worth over $30,000 more than the consideration which he received. The magnitude of the economic benefit conferred upon the charity is itself strongly probative of a donative intent. Taxpayer testified that originally he had been willing to charge the charity no interest, Tr. 22, and that

"we felt that the terms that we established for the not-for-profit corporation were rather minimal and rather generous on our part, but we were interested in being certain that

It does make two rather narrow arguments on the gift issue. First, it argues that the requisite intent did not arise until two months after the transfer was completed; and second, it argues that there could have been no gift because, in the language of the House Committee Report quoted in *Singer, supra,* taxpayer's contribution was not "made with no expectation of a financial return commensurate with the amount of the gift." [10]

The first argument fails to differentiate between the intent to make a gift—which must be present at the time of the transfer—and the intent to claim a deduction—which need only arise at the time a tax return is prepared. A taxpayer need not know at the time of making a gift that he is entitled to such a deduction. As the Supreme Court has stated, "the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter." Commissioner v. Duberstein, 363 U.S. 278, 286, 80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218. Accordingly, the fact that taxpayer may not have been aware of the possibility that he might obtain a tax deduction until after the transaction was consummated is irrelevant to the critical question whether he intended to confer a benefit on the charity at the time of the sale.[11]

the blood bank survived and continued its work." Tr. 23.

He concluded that the note received did not have a market value equal to its face value, Tr. 23–24, and that he had intended to confer a benefit on the corporation. Tr. 65. James Egan, taxpayer's attorney and a member of the board of directors of Chicago Blood Donor Service, reported that, when the sale was being arranged, "Doctor Mason and Doctor Grimm . . . were very emphatic in saying that they wanted the terms to be as liberal as possible." Tr. 96. He reported that the other board members felt that the doctors were being "very generous in the method in which they were transferring these assets." Tr. 98.

Moreover, to the extent that it is necessary to inquire into taxpayer's motivation in conferring a benefit upon the charity, cf., Commissioner v. Duberstein, 363 U.S. 278, 286, 80 S.Ct. 1190, 4 L.Ed.2d 1218, the evidence respecting taxpayer's participation in the organization and development of the blood bank provides a credible explanation for his desire to see the charity continue to function effectively in the future.

It is not our function to make an initial appraisal of the evidence to decide whether we would have concluded that taxpayer had the requisite donative intent. This is a function which a jury is particularly well qualified to perform. As the Supreme Court stated in *Duberstein*:

"Where a jury has tried the matter upon correct instructions, the only inquiry is whether it cannot be said that reasonable men could reach differing conclusions on the issue." 363 U.S. at 290–291, 80 S.Ct. at 1199.

The evidence in this case, viewed in the light most favorable to the taxpayer, supports the finding that a gift was intended. *See also* Hannigan v. Sears, Roebuck & Co., 410 F.2d 285, 287–288 (7th Cir. 1969), cert. denied, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178.

10. "Furthermore when Congress put together the Internal Revenue Code of 1954, the following statement was made in reference to section 162(b) of the Internal Revenue Code:

Subsection (b) is derived from section 23(a)(1)(B) of the 1939 Code. This section provides that no business deduction is available for any contribution which would be deductible as a charitable gift, were it not for the percentage limitation on such gifts. This was the rule for corporations under section 23(a)(1)(B) of the 1939 Code and this section now extends the rule to individuals. No substantive change is made in the application of this rule. *As under present law, it applies only to gifts, i. e., those contributions which are made with no expectation of a financial return commensurate with the amount of the gift.* For example, the limitation would not apply to a payment by an individual to a hospital in consideration of a binding obligation to provide medical treatment for the individual's employees. It would apply only if there were no expectation of any *quid pro quo* from the hospital. [H.Rep.No.1337, 83rd Cong., 2nd Sess., p. A44 (3 U.S.C.C.A.N. (1954) pp. 4017, 4180); S.Rep.No.1622, 83rd Cong., 2nd Sess., p. 196, 3 U.S.C.C.A.N. (1954) pp. 4621, 4830–4831.] [Emphasis supplied]"
449 F.2d at 420.

11. Indeed, whether a gift to an eleemosynary organization qualifies as a charitable contribution depends on various factors, among which is whether the charity qualifies as an exempt organization under § 501(c) of the Code. In this case, the successor corporation's § 501(c)(3) qualification was not learned until early 1967. Thus, whether taxpayer was not

■ The second argument overlooks the importance of determining the amount of the gift at the time it was made. Since only the difference between the value of the transferred asset and the value of the consideration received could even arguably be characterized as the "amount of the gift" within the meaning of the *Singer* formulation, it is necessary to determine whether, apart from the note itself, the taxpayer expected to receive any additional consideration commensurate with the value of that difference. The government appears to be arguing that the ultimate payment of the face value of the note will bring him additional consideration "commensurate with the amount of the gift." But payment of that note in accordance with its terms cannot enhance the value of the consideration received, measured as of the date of the gift, or reduce the value of the transferred asset. It therefore does not minimize—and certainly does not eliminate—the difference in values which represents the subject matter of the gift in this case.[12]

This case is, therefore, completely unlike the *Singer* case. In *Singer*, taxpayer made bargain sales of sewing machines to certain charitable groups. In some cases the sales were expected to produce additional business for the company; in others, no such ancillary benefit was anticipated. In both situations the court determined whether, apart from the payment of the bargain price itself, the taxpayer expected to receive additional consideration which, if commensurate with the amount of the gift, would defeat the deduction. In the case before us there is no suggestion that taxpayer will receive any financial return other than the payment of the purchase price.[13] The anticipated receipt of these future payments was fully included in the valuation of the initial consideration received at the time of transfer. Since, prior to 1969, it was well settled that a "bargain sale may produce a charitable contribution," *see, e. g., Singer, supra,* 449 F.2d at 418, we find no merit in the government's legal objection to the charitable deduction.[14]

aware that he might claim a tax deduction until after Dr. Grimm's death is irrelevant to the important question of whether he intended to confer a benefit on the charity at the time of the sale.

12. In the gift tax area the tax court has squarely held that if a promissory note bearing an especially low interest rate is used to pay the purchase price, the amount of the gift must be measured by reference to the fair market value of the note, rather than its face value. In *Gertrude H. Blackburn*, the court stated:

"It seems to us that it would be unrealistic for us to hold that a note with a face value of $172,517.65, bearing interest only at the rate of 2¼ per cent per annum and having 34½ years to run, had a fair market value on the date of its receipt equal to its face value. Undoubtedly, petitioner was fully justified in believing that the note would be paid in full according to its terms, but that factor alone does not determine the fair market value of a note. Other factors such as the rate of interest which the note bears and the length of maturity must be considered.

"After a careful consideration of all the evidence we have concluded that the note, secured by the mortgage, had a fair market value of $134,538.30 at the time it was re-

ceived by petitioner on December 31, 1947. That figure should be used in a computation of petitioner's gift tax arising from the gift which she made to her two children on December 31, 1947."
20 T.C. 204, 207 (1953).

The I.R.S. has announced that it will not follow the contrary conclusion reached in Johnson v. United States, 254 F.Supp. 73 (N.D.Tex. 1966). *See* Rev.Rul. 73–61, Int.Rev.Bull. 1973—5, 15.

13. The rationale of *Singer* would be applicable if, for example, in exchange for the bargain sale taxpayer had expected that the blood bank might employ him to perform various professional services for a consideration roughly commensurate to the value of the bargain sale to the charity.

14. Similarly, the courts have held that gifts of the use of real property to a charity give rise to charitable contribution deductions in the amount of the fair market value of the rental income forgone. *See* Threlfall v. United States, 302 F.Supp. 1114 (W.D.Wis.1969); Passailaigue v. United States, 224 F.Supp. 682 (M.D.Ga.1963); Thriftimart, Inc., 59 T.C. 598 (1973); Priscilla M. Sullivan, 16 T.C. 228 (1951).

## II.

The government's "tax benefit" argument also rests on a misconstruction of the character of the gift. If, as we are convinced it should be, the gift is identified as the *difference* between the value of the consideration paid by the charity and the value of the property received by the charity, both measured as of the date of the gift, it necessarily follows that payment of the note in accordance with its terms will not diminish the amount of the gift, or restore to taxpayer any benefit which he has conferred upon the charity.[15]

The need to consider the government's tax benefit argument arises only after (a) we have decided that a gift was made at the time of the bargain sale on January 1, 1966, and (b) a subsequent event has occurred which arguably constitutes a restoration of at least a part of the subject matter of the gift. Thus, our analysis of this issue starts from the premise that the *difference* between the value of the transferred asset and the value of the consideration was a gift. And since the only taxable year under review in this case is 1966, the government's claim to a setoff rests entirely on the hypothesis that a payment or payments made by the charity in that year reduced that difference. In that year, however, the charity merely made the cash downpayment and delivered taxpayer a check for the first installment payment under the note.[16] The gift issue was resolved by focusing attention on the time of the transfer; the "tax benefit" argument must be resolved by focusing on the time of the alleged restoration of the subject matter.[17]

■ It is clear that the tax benefit rule applies to the recovery by a donor of a gift he makes to a charity; to the extent that the earlier charitable contribution deduction gave rise to a tax benefit, the taxpayer must report the return of the gift property as ordinary income. In Alice Phelan Sullivan Corp. v. United States, 381 F.2d 399, 180 Ct.Cl. 659 (1967), the taxpayer had made two gifts of real property to a charity with the stipulation that the property be used for certain purposes. Seventeen years later, the charity returned the property. The Court of Claims held that the corporation had to report the return of the property as ordinary income, taxable at the tax rates in effect in the year of recovery.[18]

■ In this case, however, the donee has not returned the subject matter of the gift to the donor. The payment of the note in accordance with its terms does not eliminate,or even modify, the

---

**15.** Alternatively, the gift might be characterized as the value to the charity of the taxpayer's willingness to forgo the receipt of the fair market rate of interest on this note over this extended period of time. The fact that the taxpayer will ultimately be paid the principal sum does not mean that the charity has not been benefited or that the taxpayer has in fact recovered that which he has forgone.

**16.** There is a dispute on the record as to whether taxpayer actually collected on the note during 1966, the only tax year in question in this case. While a check for payment due July 1, 1966 was received and reported on the taxpayer's 1966 tax return, he contends that it was never cashed and was later cancelled. Thus, taxpayer argues that there can be no government setoff on a tax benefit theory for that year. The government responds that taxpayer in fact admitted cashing the check some two years later (Tr. 24), and that the receipt of the check in 1966 gave rise to income, and any concomitant setoff, in that year. We need not resolve this dispute because we conclude that the government is not entitled to a setoff in any event on its tax benefit theory.

**17.** This is clear from the accepted tax benefit rule:

"The general rule, not expressly stated in the Code but developed through the case law, is that, if an amount deducted from gross income in one taxable year is recovered in a later year, the recovery is income in the later year." 1 Mertens, Law of Federal Income Taxation § 7.34, p. 111 (Rev.1974) (footnotes omitted).

**18.** An earlier Court of Claims decision, Perry v. United States, 160 F.Supp. 270, 142 Ct.Cl. 7 (1958), recognized that the return of property by a charity could give rise to the application of the tax benefit rule. In that case, however, the court concluded that the value of the property returned should be taxed at the rates prevailing at the time the deduction had originally been taken.

bargain aspect of the sale by the taxpayer to the charity. If additional consideration had been delivered to the taxpayer subsequent to the closing—perhaps by the substitution of a note bearing a higher interest rate—the application of the tax benefit rule would be called into play. But subsequent events which may merely change the value of the note—such as, for example, a change in prevailing interest rates, or a change in the financial status of the obligor, or even a record of making installment payments regularly when due and thereby possibly changing the risk factor which may have played a part in appraising the original value of the note—do not provide the donor with any additional consideration or involve any restoration of the subject matter of the gift within the meaning of the tax benefit rule.[19] We therefore hold that the government has failed to establish any right to a setoff under that rule as applied to the tax year at issue in this case.

### III.

The taxpayer has cross appealed from the district court's determination that $193.92 of original issue discount arose out of the transaction and was taxable as ordinary income. Although the government has not resisted this appeal, taxpayer has not persuaded us that the district court committed reversible error in this respect. See notes 3 and 8, supra.[20] Accordingly, the judgment of the district court is

Affirmed.

19. The government argues that the holding in Alice Phelan Sullivan Corp. v. United States, supra, requires us to apply the tax benefit rule in this case because the Sullivan taxpayer was not allowed any charitable contribution deduction for the use of the donated property during the period between its gift and its return. But no such deduction was claimed in that case. The original deductions were measured by the total value of the fee interests which had been donated to charity. When the fees were returned 15 years later, the recoupment was taxable as income. Had the property been worth less when it was returned, whether on account of deterioration resulting from use or merely because of market fluctuation, only the value at the time of return would have been taxed. But that result follows from the fact that the tax benefit rule focuses on value at the time of recoupment and has nothing to do with the fact that, in theory at least, the taxpayer might originally have made a gift of the temporary use of the property rather than his entire interest in it.

20. We therefore are not required to decide whether original issue discount may arise from the issuance of a note in exchange for property other than cash—a question left open in Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 146–147, 94 S.Ct. 2129, 40 L.Ed.2d 717—or whether we would have computed the amount of the discount as $193.92 or $196.92.