DAVIS, Circuit Judge.
 

 These are consolidated appeals from the decision of the United States Claims Court, Kozinski,
 
 C.J.,
 
 in
 
 American Bar Endowment v. United States,
 
 4 Cl.Ct. 404 (1984). In No. 84-988, the Government appeals from that portion of the ruling which held that appellee American Bar Endowment (the Endowment) earns no unrelated business taxable income from a fund-raising program in which the Endowment obtains a group insurance policy for its members and keeps (by assignment) the refunded dividends which accrue. In No. 84-1000, participating members of the Endowment (the individual taxpayers) appeal from the Claims Court’s decision that they may not deduct the premium dividends (which they assign to the Endowment) as charitable contributions. In No. 84-988, we affirm; in No. 84-1000, we reverse and remand for further proceedings in accordance with this opinion.
 

 I.
 

 Background
 

 The American Bar Endowment is a charitable organization the purpose of which is to support educational projects and research in the legal field. The Endowment is the principal source of funds for the American Bar Foundation, a research organization under the aegis of the American Bar Association (ABA). Although all members of the ABA are automatically members of the Endowment, the two organizations are separate legal entities. Because the Endowment is devoted to furthering educational projects, the Internal Revenue Service (IRS) has determined that it is exempt from taxation under 26 U.S.C. § 501(c)(3) (1982).
 
 [1]
 

 In the early 1950’s the Endowment established the insurance plan which is the crux of these cases. In the now-pertinent particulars the plan is similar to any insurance program in which a central organization holds a group policy for which the organization’s members pay a portion of the premium reflecting the amount of coverage they desire. In order to participate in the Endowment’s plan, however, a member must assign to the Endowment all dividends to which he or she might be entitled. These dividends represent the difference between the premiums paid by the participants and the actual cost of coverage to the insurance company in terms of claims settlement, administrative expenses, and profits. Cf
 
 . Penn Mutual Life Ins. Co. v. Lederer,
 
 252 U.S. 523, 525, 40 S.Ct. 397, 398, 64 L.Ed. 698 (1920) (“It is the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policyholder.”) Members who refuse to assign their right to the dividends are, according to the terms of the plan, not entitled to participate. The terms of the assignment are plainly set forth above the signature line in the contract between the participant and the Endowment.
 

 During the period at issue here (tax years 1979-1981), the Endowment purchased policies from two insurance companies: New York Life Insurance Co. (a life insurance policy) and Mutual of Omaha Insurance Co. (other policies,
 
 e.g.,
 
 major medical and disability income insurance). The Endowment purchased the policies through a broker, James Group Service,
 
 *1575
 
 Inc. The insurance companies paid the broker a small percentage of the premiums as a commission.
 

 The Endowment took sole responsibility for arranging the terms of the insurance, including the premiums and terms of coverage. Because the Endowment sought to maximize dividends, it had an incentive to set the premiums as high as possible without discouraging participation. The Endowment therefore set the premium at a level competitive with other insurance on the market; what the Endowment hoped is that it would benefit from the high dividends it could recoup as a result of the generally favorable morbidity and mortality experience of the attorney participants. This strategy has been extraordinarily successful. In the twenty-eight years from its inception to the time of this suit, the plan has grown from 12,000 to 55,000 participants. During this period the Endowment has recouped $81.9 million in dividends, of which it has distributed $63 million for educational projects. Currently, the Endowment employs approximately 40 people to administer the insurance plan.
 

 Each year in which the Endowment receives a dividend on a group policy, which is more often than not, the Endowment notifies the participants as to the percentage of the total premium paid on that policy which it subsequently recouped as a dividend. These percentages are often as high as 30-40 percent, and sometimes 50 percent or over. Along with the notice, the Endowment advises participants that, in its opinion, that portion of the individual participant’s payment which the Endowment received as part of the dividend is a tax deductible charitable contribution for the participant. As the prospect of litigation arose, the Endowment has included in the annual notice a caveat to the effect that the IRS does not necessarily share its views.
 

 These cases present two issues for our resolution. First, do the dividends which the Endowment receives from the insurance companies fall within the provisions concerning the taxation of the unrelated business income of otherwise tax-exempt organizations (such as the Endowment)? Second, are the participants in the Endowment’s insurance plans entitled to deduct from their gross income that portion of their insurance payments which the Endowment recoups in dividends? We deal with these questions in the context of the separate appeals to which they pertain.
 

 II.
 

 The Government’s Appeal—Taxability of the Endowment
 

 A.
 

 Congress has placed several provisions in the tax laws which grant beneficial treatment to charitable contributions. Of central importance are the tax forgiveness provisions in sections 170 and 501. Section 170(a), with exceptions and limitations not relevant here, authorizes taxpayers to deduct the value of charitable contributions from their gross income, thus allowing charitable donors to avoid taxation on that amount. Section 501(a) correspondingly exempts charitable organizations from taxation on the donations they receive. Under this arrangement, donations to charity are never taxed, either in the donor’s hands or in the charity’s pocket.
 

 In the Revenue Act of 1950, Pub.L. No. 81-814, 64 Stat. 947, Congress modified this scheme to insure that a charitable organization does not engage in a commercial enterprise and thus take unfair advantage of its tax-exempt status to the detriment of competing businesses subject to taxation. The statute created an unrelated business income tax (unrelated business tax) on the income that a charitable organization receives from a trade or business unrelated to its charitable purpose.
 
 [2]
 

 See
 
 sections
 
 *1576
 
 511(a)(1), 512(a)(1). The term “unrelated trade or business” (for the purposes of this tax) means
 

 any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance of such organization of its ... purpose or function constituting the basis for its exemption under section 501.
 

 Section 513(a). In the Tax Reform Act of 1969, Pub.L. No. 91-172, 83 Stat. 542, Congress clarified the meaning of “trade or business”: “For the purposes of this section, the term ‘trade or business’ includes any activity which is carried on for the production of income from the sale of goods or the performance of services.” Section 513(c).
 

 The regulations interpreting section 513 set forth a three-part test for determining whether a charitable organization’s activity generates income subject to the unrelated business tax:
 

 [GJross income of an exempt organization subject to the tax imposed by section 511 is includible in the computation of unrelated business taxable income if: (1) It is income from trade or business; (2) such trade or business is regularly carried on by the organization; and (3) the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization’s performance of its exempt functions.
 

 Treas.Reg. § 1.513.1(a), 26 C.F.R. § 1.513-1(a) (1984). By stipulation of the parties, only part (1) of this test—whether the Endowment carries on a trade or business by conducting the insurance plan—is at issue in the case regarding the Endowment’s tax liability.
 

 B.
 

 In a technical advice memorandum dated July 3, 1980, the IRS informed the Endowment that, in the IRS’ opinion, the insurance plan is an “unrelated trade or business” within the meaning of the statutory provisions imposing the unrelated business tax, and that the dividends constitute taxable income. The IRS reasoned that the Endowment sells its services as a group policyholder, without which its members could not enjoy the benefits of the plan’s group rates.
 
 See
 
 G.C.M. 38940 (April 15, 1982),
 
 reprinted in
 
 [1982-1983 Transfer Binder] IRS Positions Rep. ¶ 1127 (for a full exposition of the IRS’ reasoning). Based on this conclusion, the IRS conducted an audit and assessed a deficiency against the Endowment for the tax years 1979 and 1980, plus interest on the 1980 payment.
 
 [3]
 
 This was paid. The Endowment also paid taxes on the dividends it received in 1981. On July 15, 1982 the Endowment filed a claim with the IRS for a refund of these payments. The IRS disallowed the claim on August 6, 1982. This refund suit followed and trial was held, resulting in factual findings and legal rulings.
 

 In its opinion, the Claims Court undertook the rigorous task of parsing the relevant statutory provisions. As to the Endowment, the court deemed the appropriate query to be whether the Endowment “is ‘operated in a competitive, commercial manner’.” 4 Cl.Ct. at 409 (quoting
 
 Disabled American Veterans v. United States,
 
 650 F.2d 1178, 1187, 227 Ct.Cl. 474 (1981)
 
 (per
 
 curiam). If the insurance plan was found to be similar to a commercial, profit-making enterprise, the plan would fit within the definition of “trade or business” set forth in section 513(c) and the dividends would be income subject to taxation under the unrelated business provisions. Otherwise, they would merely be accumulated charitable funds and not subject to taxation.
 

 The court concluded that the relevant facts and factors—which have been found here—including the Endowment’s phenomenal success (particularly the astounding proportion of its gross premiums recouped as dividends); the persistent and fundamental fund-raising motivation of the
 
 *1577
 
 program; and the knowledgeable approval of and consent to the program by the ABA’s members—compelled the conclusion that the Endowment does not operate in a competitive, commercial manner. 4 Cl.Ct. at 410-11. Moreover, noting that section 513(c) of the unrelated business provisions requires taxation only of that income derived “from the sale of goods or the performance of services”, the court determined that the Endowment’s receipts have far exceeded the value of any services which it might have performed in the course of its administration of the plan, and thus did not fit within the statutory definition of income from a trade or business.
 
 Id.
 
 at 411.. Finally, the court noted that Congress’ primary purpose in enacting the unrelated business income tax was to compensate for the unfair advantage that tax-exempt organizations have when they compete in the marketplace with commercial enterprises. Because (1) the Endowment employs commercial underwriters and brokers rather than performing these functions itself, and (2) the Endowment seeks to raise the price of its insurance rather than undersell other plans, the Claims Court held that the Endowment does not effectively compete with commercial, taxable insurance businesses, and therefore does not represent the sort of enterprise at which the unrelated business income tax provisions are directed.
 
 Id.
 
 at 413-14.
 

 C.
 

 In No. 84-988, we affirm on the basis of Chief Judge Kozinski’s opinion that portion of the decision below which held that administration of the insurance plan does not constitute an unrelated trade or business to which the unrelated business tax applies. The court applied the correct standard for determining whether the plan is a “trade or business” under section 513(c), properly found facts, and identified appropriate and convincing reasons for concluding that the Endowment did not meet the “competitive” and “commercial” criteria of
 
 Disabled American Veterans.
 
 We add only a few words in response to some of the Government’s arguments on this appeal.
 

 The Government considers this case to be identical to cases from other courts involving the application of the unrelated business provisions to group insurance plans. The three decisions which the Government cites are
 
 Professional Insurance Agents of Michigan v. Commissioner,
 
 726 F.2d 1097 (6th Cir.1984);
 
 Carolinas Farm & Power Equipment Dealers v. United States,
 
 699 F.2d 167 (4th Cir.1983); and
 
 Louisiana Credit Union League v. United States,
 
 693 F.2d 525 (5th Cir.1982). Chief Judge Kozinski found these cases to be inappo-site, primarily because they involved insurance plans run by business leagues rather than charitable organizations. He reasoned that, because donations by members to the organization are business deductions and not charitable contributions, the receipts from their insurance plans could not be charitable contributions but must be income. We note an additional ground for distinguishing these cases: the business leagues received a stipend from the insurance companies for services provided to these companies, and not merely experience dividends which their members allowed them to keep. Their profits therefore fell within the definition of “trade or business” (“income from the ... performance of services”) contained in section 513(c). Furthermore, the business leagues, in performing these services, directly competed with commercial enterprises—such as James Group Service, the Endowment’s broker—a situation in which Congress said the unrelated business tax should be imposed. S.Rep. 2375,
 
 supra; see also
 
 Treas. Reg. § 1.513-l(b),
 
 supra; Disabled American Veterans,
 
 650 F.2d at 1181 & n. 4.
 

 The Government also argues that the very factors evaluated by the Claims Court establish that the Endowment operated in a competitive, commercial manner. We are directed particularly to the fact that the Endowment set its rates “with reference to the rates for other insurance available in the market” and thereby maximized its receipts,
 
 i.e.,
 
 the Endowment set
 
 *1578
 
 out to make as much “profit” as possible. 4 Cl.Ct. at 406. The Government concludes that this objective is characteristic of a commercial enterprise and results in direct competition with other group insurance services. Unlike what some other courts may do, this court does not find “profits,” or the maximization of revenue, to be the controlling basis for a determination of whether the unrelated business tax provisions apply.
 
 [4]
 
 We consider not only the amount of money the charitable organization receives, but the source and character of those funds. In this connection the Claims Court specifically and permissibly rejected the Government’s contention that the dividends represent a payment for the Endowment’s services.
 
 [5]
 
 Because the Endowment’s accumulation of funds was not the result of a commercial exchange, we agree with the Claims Court’s view that the dividends do not constitute “profits” which fall within the definition of section 513(c).
 
 [6]
 
 A charity should not be subject to taxation merely because its charitable solicitations are successful. This would, however, be the result if we adopted the IRS’ reasoning in this ease.
 

 III.
 

 The Taxpayers’ Appeal—Deductible Charitable Contributions
 

 A.
 

 The taxpayers’ appeal concerns the effect of section 170 on the agreement to assign dividends to the Endowment. Section 170(a) provides: “There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year.” Section 170(c) provides only that a contribution is a “contribution or gift to or for the use of” certain types of organizations, of which the Endowment is one. The only real clue as to what Congress intended by the term charitable contribution is a comment regarding section 162(b),
 
 [7]
 
 in which Congress said that charitable contributions are donations “made with no expectation of a financial return commensurate with the amount of the gift.” H.Rep. No. 1337, 83d Cong., 2d Sess. (1954),
 
 reprinted in
 
 1954 U.S.Code Cong. & Ad.News 4018, 4180; S.Rep. No. 1662, 83d Cong., 2d Sess. (1954),
 
 reprinted in id.
 
 at 4621, 4831. The issue on the taxpayers’ appeal is whether the required payments of the dividends to
 
 *1579
 
 the Endowment were deductible contributions.
 

 B.
 

 By a letter of August 7, 1980, the Endowment informed its members that, under a ruling which the Endowment had requested, the IRS, beginning in tax year 1980, would not allow participants to deduct under Section 170 the dividend portion of their insurance premiums recouped by the Endowment as charitable contributions. The individual taxpayers in this case, all of whom failed to deduct the portion of his dividend recouped by the Endowment in 1981, filed a claim for a refund. In each case, six months passed without a response from the IRS. They then filed a timely complaint in the Claims Court which was consolidated with the Endowment’s case. A trial was also held on the individual taxpayers’ case.
 

 The Claims Court recognized that a given transaction can possess dual characteristics, being at the same time a commercial transaction and a charitable contribution. The relevant question (according to the court) is the size of each of these components. Under the rule thought to guide such an inquiry, “the taxpayer must demonstrate that he bought goods or services for more than their economic value, with the intention that the excess be used to benefit a charitable enterprise.”
 
 Id.
 
 at 415, (citing Rev.Rul. 67-246, 1967-2 C.B. 104, 105). If the taxpayer receives from the charity some recompense entirely commensurate with the value of the payment, then no dual payment situation arises because the charitable contribution portion of the payment is zero. In addition, under the Claims Court’s formulation, the taxpayer must prove that the payment was accompanied by a specific intention to make a charitable contribution.
 

 In an effort to determine the value of the compensation received by the participants in the Endowment’s insurance plan, the Claims Court looked to the value of similar insurance plans available to each taxpayer. That was the critical test. In the Claims Court’s eyes, three of the taxpayers failed to prove that they were eligible to participate in a cheaper insurance plan; they thus failed to establish the charitable contribution component of their payments. One taxpayer demonstrated that he was eligible for cheaper insurance, but he failed to state that he knew of that insurance during the years in issue; the court found that he therefore failed to establish the requisite intent to make a charitable contribution. All the individual claims were thus disallowed.
 

 C.
 

 The taxpayers’ case is unusual. Neither side has cited, nor have we found in our research, any case in which the issue was the deductibility under section 170 of an assignment of insurance dividends to a charitable organization which held the group insurance policy. On appeal, the Government argues that the Claims Court’s decision correctly placed the burden of proving a charitable motive—which the Government argues is the
 
 sine qua non
 
 of a deduction under section 170—on the taxpayers. The Government also defends the court’s particular method of determining charitable motive. We hold, however, that well established principles of tax law from this circuit and elsewhere require that we reject the unitary approach of the court below and remand for consideration in accordance with those principles as they should be applied to this unique situation.
 

 As noted
 
 supra,
 
 the tax code does not expressly define the term “charitable contribution.” We can make some headway, however, by determining what a charitable contribution is not. First and foremost, a charitable contribution is not an exchange. In
 
 Singer Co. v. United States,
 
 449 F.2d 413, 196 Ct.Cl. 90 (1971), the Court of Claims established that a donation is not deductible if the donor anticipates substantial economic benefit from the act. The court stated:
 

 It is our opinion that if the benefits received.
 
 [sic
 
 ] or expected to be received,
 
 *1580
 
 are substantial, and meaning by that, benefits greater than those that inure to the general public from transfers for charitable purposes (which benefits are merely
 
 incidental
 
 to the transfer), then in such case we feel the transferor has received, or expects to receive, a
 
 quid pro quo
 
 sufficient to remove the transfer from the realm of deductibility under section 170.
 

 Id.
 
 449 F.2d at 423 (emphasis in original);
 
 accord, Ottawa Silica Co. v. United States,
 
 699 F.2d 1124, 1132 (Fed.Cir.1983)
 
 (per curiam)
 
 (“The plain language [of
 
 Singer
 
 ] clearly indicates that a ‘substantial benefit’ received in return for a contribution constitutes a
 
 quid pro quo,
 
 which precludes a deduction.”)
 

 In
 
 Singer,
 
 the taxpayer sold sewing machines to schools at bargain prices with the (unrealized) expectation that those trained on Singer machines would later purchase Singer products. In
 
 Ottawa Silica,
 
 the taxpayer donated a parcel of land to a school district in anticipation of increasing the value of its surrounding holdings, which the taxpayer planned to divide into residential lots. In each case the court ruled that the expectation of future benefits removed the donation from the term “charitable contribution” as used in section 170.
 

 On the other hand, the courts and the IRS have recognized that, as a practical matter, one can transact business with a charitable organization in such a way that the
 
 quid pro quo,
 
 though more than
 
 “incidental
 
 to the transfer” under the
 
 Singer
 
 test, is never expected by either party to the transaction to have a substantial bearing on the amount of the gift. An oft repeated situation is the purchase of tickets to charitable functions
 
 (e.g.,
 
 dinners), the return for which (the meal and any entertainment) is nowhere near the worth of the price of admission. The IRS has taken the position on many occasions that the donor is entitled to a deduction for the difference between the amount of the donation and the fair market value of whatever is received (or at least expected) in return. Rev.Rul. 67-246, 1967-2 C.B. 104 (price of tickets to charity ball deductible to the extent it exceeds the fair market value of attending the function); Rev.Rul. 76-185, 1976-1 C.B. 60 (agreement by which taxpayer agreed to refurbish an old house in exchange for use of the house for a term of years resulted in a deductible contribution to the extent that the renovation expenses exceeded the fair rental value of the property for the term of the lease). In Rev.Rul. 68-432, 1968-2 C.B. 104, 105, the IRS stated:
 

 Whenever the discrepancy between the size of the membership contribution and the potential monetary benefits is so great as to make it reasonably clear that the payment is of a dual character, the [IRS] will give due consideration to the possible separation on a uniform basis of that portion of the total payment that may properly be treated as a charitable contribution under section 170 of the Code.
 

 The courts have also adopted this rule.
 
 Marshall v. Welch,
 
 197 F.Supp. 874 (S.D.Ohio 1961) (donation to nursing home deductible in amount in excess of the cost of a wheelchair for donor’s son purchased by the home);
 
 Arceneaux v. Commissioner,
 
 36 T.C.M. (CCH) 1461, 1464 (1977) (“[T]o prevail, petitioners must show that the amount paid in 1972 to the [charity] exceeded the value of the services rendered by the adoption agency
 
 and
 
 that such excess was intended as a gift”) (emphasis in original);
 
 DeJong v. Commissioner,
 
 36 T.C. 896, 900 (1961),
 
 aff'd,
 
 309 F.2d 373 (9th Cir.1962) (deduction of contribution to school disallowed to the extent of the market value of education of taxpayer’s children).
 

 In Rev.Rul. 67-246,
 
 supra,
 
 the IRS set forth two conditions for proving a charitable component to a transaction in this context. First “an essential element is proof that the portion of the payment claimed as a gift represents the excess of the total
 
 *1581
 
 amount paid over the value of the consideration paid therefor.” 1967-2 C.B. at 105. The IRS recognized, however, that under this formulation a person who enters into a bad bargain with a charity,
 
 (i.e.,
 
 the purchase price exceeds the fair market value of the property or services received) might attempt to deduct the difference as a charitable contribution. The IRS therefore ruled that evidence pertaining to the nature of the exchange is also critical:
 

 Another element which is important in establishing that a gift was made in such circumstances, is evidence that the payment in excess of the value received was made with the intention of making a gift. While proof of such intention may not be an essential requirement under all circumstances and may sometimes be inferred from surrounding circumstances, the intention to make a gift is, nevertheless, highly relevant in overcoming doubt in those cases in which there is a question whether an amount was in fact paid as a purchase price or as a gift.
 

 Id.
 
 The Court of Claims imposed a similar standard in
 
 Singer;
 
 the court denied the deduction as to the sales to schools because Singer expected an important business
 
 quid pro quo,
 
 arid the sales were thus “of a business nature and not charitable.” 449 F.2d at 424.
 
 Accord, Ottawa Silica,
 
 699 F.2d at 1132 (the nature of the arrangement in that case “effectively destroyed the charitable nature of the transfer.”)
 

 In
 
 Rusoff v. Commissioner,
 
 65 T.C. 459 (1975),
 
 aff'd,
 
 1977-1 USTC ¶ 9338 (2d Cir. 1977), the Tax Court considered the question whether an arrangement by which a group of inventors assigned to Columbia University one-half of their interest in a patent for a cigarette filter resulted in a deductible contribution by the inventors. Columbia agreed to investigate the development of the filter and defend the patent. The court looked to the circumstances surrounding the assignment, including “events surrounding the transfer and the legal documents executed by the parties,” in an effort to “expose the true nature of the transaction.”
 
 Id.
 
 at 469. The Tax Court concluded that “the evidence in its entirety ... clearly shows that the transfer to Columbia was a business transaction, not a charitable contribution.”
 
 Id.
 

 D.
 

 As we have pointed out, the Claims Court in the instant case concluded that these standards require a definite comparison between the cost of the Endowment’s insurance plan and the cost of other plans available to the particular taxpayers—and also that the taxpayer has the burden of showing that the Endowment’s plan is more expensive. The theory underlying this position is that, if the Endowment’s insurance is the cheapest available, then the taxpayers’ participation is “economically motivated, that is, where the payment is made to obtain goods or services for which the taxpayer would be willing to pay the full price even absent the charitable contribution.” 4 Cl.Ct. at 415. Our difficulty with this comparison, as the precise litmus test of charitable vs. non-eharitable transactions, is that it is an incorrect definitization of the proper standard.
 

 First, the Claims Court’s test requires that the taxpayers prove more than a charitable transaction, as
 
 Singer
 
 requires, but actually affirmatively prove a charitable motivation of disinterested generosity.
 
 [8]
 
 In
 
 Singer,
 
 however, the Court of Claims expressly rejected a pure motivational requirement, noting,
 
 inter alia,
 
 that this requirement places too harsh a burden on taxpayers. 449 F.2d at 421-22.
 

 Second, the Claims Court’s comparison can support the opposite conclusion from the one it draws. By comparing the cost of
 
 *1582
 
 different plans, the court below failed to take into account the fact that, in other plans, the participants are entitled to their dividends. This lowers the net cost to them of the insurance. To the extent that it is relevant, this comparison can be said to indicate that the participants voluntarily forwent a right to which they would otherwise be entitled as a consequence of their participation in the plan.
 

 Third, the Claims Court’s overly-precise formulaic test assumes that all participants are purely “economic” persons, acting solely on a careful and detailed comparative investigation of pecuniary results and expectations. That is by no means a universal assumption and there are many who may be able to show that they made a charitable donation of the dividends to the Endowment, without proving that they deliberately and intentionally chose, after careful inquiry, the Endowment plan over other “better deals.” In life, an intention to enter into a charitable transaction is often intertwined with other motivations, including some that are non-charitable.
 

 Rather, the general question to be posed according to
 
 Singer
 
 and
 
 Ottawa Silica
 
 is whether the transaction between the Endowment and the taxpayers involving the assignment of dividends “was of a business nature and not charitable.” 449 F.2d at 424. This determination must flow from an examination of all the pertinent circumstances surrounding the individual transaction—there is no single-factor test.
 
 [9]
 
 For instance, the record in this case shows that several participants in the Endowment’s plan sought to evade or negotiate away the requirement that they assign the dividends. Some even sought to negotiate with the Endowment to remove the assignment clause from the contract.
 
 [10]
 
 A trial court might reasonably conclude that these individuals expected that the Endowment would provide the best possible insurance opportunity despite the assignment requirement; that this expectation colored the transaction and outweighed other factors; that the transaction was therefore of a business and not a charitable nature; and that the taxpayer should be denied a deduction. On the other hand, many participants may have entered the Endowment’s plan because of the notion that they could accommodate their insurance needs and at the same time substantially support a worthy charitable goal (and, indeed, generate a tax deduction). As to these individuals, a trial court might draw the exact opposite conclusion, and decide that a deduction is proper.
 
 [11]
 
 It should not be too difficult for participants of this latter type to present a
 
 prima facie
 
 case for the deduction. In the light of the Endowment’s persistent and public efforts to enhance its charitable funds, it would be enough, until properly challenged, for participants simply to make a sworn assertion that they wanted to aid that charitable endeavor and entered the Endowment’s plan because it enabled them to do so. The Government could, of course, controvert that position and suggest factors showing that the transaction was basically business-oriented.
 

 As for the particular taxpayers involved in this case, the record is almost completely bare as to the nature of their dealings with
 
 *1583
 
 the Endowment outside of the fact that they did indeed participate in the Endowment’s plan and knew about the requirement to assign the dividends. We therefore reverse and remand for such further proceedings as are appropriate to determine whether the relationship between the Endowment and the taxpayers was predominately of a business nature or whether the transaction did have a substantial charitable component.
 

 For these reasons, No. 84-988 is affirmed and No. 84-1000 is reversed and remanded.
 

 AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
 

 [1]
 

 . All further statutory citations are to this edition of title 26, the Internal Revenue Code of 1954, as amended.
 

 [2]
 

 .
 
 See
 
 S.Rep. No. 2375, 81st Cong., 2d Sess. (1950),
 
 reprinted in
 
 1950 U.S.Code Cong.Serv. 3053, 3081 ("The problem at which the tax on unrelated business income is directed is primarily that of unfair competition.”); Treas.Reg. § 1.513—1(b), 26 C.F.R. § 1.513-l(b) (purpose of unrelated business tax is to put "the unrelated business activities of certain tax exempt organizations on the same tax basis as the nonexempt business endeavors with which they compete”).
 

 [3]
 

 . The record is unclear as to why the IRS assessed no interest on the 1979 deficiency.
 

 [4]
 

 .
 
 Compare, e.g., Louisiana Credit Union League,
 
 693 F.2d at 532 (intent to earn a profit determinative),
 
 with Iowa State Univ. v. United States,
 
 500 F.2d 508, 517-18, 205 Ct.Cl. 474 (1974) (profits are evidence of a commercial purpose, but not conclusive).
 

 [5]
 

 .
 
 Compare Disabled American Veterans,
 
 650 F.2d at 1187-88 ($5 contribution viewed as payment in exchange for trinket of substantial value);
 
 Steamship Trade Assn. of Balto. v. Commissioner,
 
 81 T.C. 303, 312 (1983) ("Petitioner [a business league which administers its members’ employee vacation and annual income funds] clearly sells a service for which it receives a substantial sum of money”),
 
 aff'd,
 
 757 F.2d 1494 (4th Cir.1985).
 

 [6]
 

 . On the conclusion reached below, which we accept, our refusal to view the recouped dividends as payment for the Endowment’s services is consistent with the IRS’ own memoranda. In G. C.M. 38940 (April 15, 1982),
 
 reprinted in
 
 [1982-1983 Transfer Binder] IRS Positions Rep. (CCH) ¶ 1127 at 3444, the IRS stated that a group policy holder such as the Endowment "serves as group policyholder
 
 in exchange for which
 
 the individual insured members agree to pay premiums and irrevocably assign their share of the premium refunds.” (emphasis in original.) In G.C.M. 38955 (June 29, 1982),
 
 reprinted in
 
 [1982-1983 Transfer Binder] IRS Positions Rep. (CCH) ¶ 1157, the IRS stated that a similar plan did not subject a charitable organization to taxation if it offered to distribute the dividends to those participants who so requested. The IRS concluded that the offer of a rebate negated the presumption that the dividend was consideration for the organization’s services. In the present case, the Claims Court specifically found that the assignment of dividends was not an exchange for services, but rather reflected the intention of the membership to support the Endowment’s charitable activities. This case therefore falls within the rule of G.C.M. 38955, rather than G.C.M. 38940. In any event, we fail to see how one plan competes any less with commercial group insurance plans than the other. If any difference exists, the plan which offers to distribute the dividends presents the greater possibility of competition with taxed organizations.
 

 [7]
 

 . Section 162(b) provides that contributions which exceed the limitations of section 170 are not deductible as trade or business expenses.
 

 [8]
 

 . In particular, the Claims Court required that, to be deductible, the insurance plan must be a bad deal for the taxpayer, and the taxpayer must know that he could do better elsewhere. 4 Cl.Ct. at 417-18. This indicates a predominant motivational requirement of disinterested generosity, to be proved by the taxpayer.
 

 [9]
 

 . Taxpayers seem to say that the only test is whether the value of the services rendered by the charity is greater than or equal to the claimed charitable donation—and that in the present case it is clear that Endowment’s services were worth much less than the assigned dividends. Like the Claims Court’s single-factor formula, taxpayers’ position has the advantage of simplicity but it flies in the face of the multifaceted inquiry mandated by
 
 Singer-Ottawa Silica
 
 which looks at the entire transaction, including of course the factor of relative values, but also that of overall purpose, donative intent, etc.
 

 [10]
 

 . The tenor of a negotiation, indeed the fact of a negotiation itself, may indicate that the resulting agreement is of a business and not a charitable character.
 
 Rusoff,
 
 65 T.C. at 471.
 

 [11]
 

 . For example, “The magnitude of the economic benefit conferred upon the charity is itself strongly probative of a donative intent."
 
 Mason v. United States,
 
 513 F.2d 25, 27 n. 9 (7th Cir. 1975)
 
 (per
 
 Stevens, J.).